UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| BAYER CROPSCIENCE LP and MONSANTO TECHNOLOGY LLC, | |
| Plaintiffs, | |
| v. | Case No. <u>5:21-cv-00070-H</u> |
| TEDDY WILLIS, | |
| Defendant. | |

**BRIEF IN SUPPORT OF PLAINTIFFS'**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

Under Rule 56 of the Federal Rules of Civil Procedure, Plaintiffs Bayer CropScience LP and Monsanto Technology LLC (collectively referred to as "<u>Bayer</u>") submit this brief in support of their Motion for Summary Judgment.

## <u>TABLE OF CONTENTS</u>

I.      LIVE PLEADINGS OF THE PARTIES...................................................................... 1

II.     INTRODUCTION ..................................................................................................... 1

III.    STATEMENT OF UNDISPUTED FACTS................................................................ 2

      A.     Bayer Patented the Bollgard II®, Roundup Ready Flex®, and Xtend
           Traits, and Imposes License Requirements to Use Same. ..................................... 2

           1.     Bayer's Patented Bollgard II® Trait. ....................................................... 2

           2.     Bayer's Patented Roundup Ready Flex® Trait. ......................................... 3

           3.     Bayer's Patented Xtend Trait..................................................................... 4

           4.     Bayer's License Requirements for the Bollgard II®, Roundup
                Ready Flex®, and Xtend Traits. ................................................................. 5

      B.     The Asserted Patents are Valid. ........................................................................... 6

      C.     Willis Received Bayer-Traited Cottonseed from Caswell............................... 6

      D.     Willis Sold and Offered to Sell the Caswell Cottonseed, Containing
           Bayer's Patented Bollgard II®, Roundup Ready Flex®, and Xtend Traits............ 7

      E.     The Caswell Cottonseed, Collected from Williams, Meets Every
           Limitation of the Asserted Patents. ..................................................................... 10

IV.     LEGAL STANDARD .............................................................................................. 11

V.      ARGUMENT AND AUTHORITIES ...................................................................... 12

      A.     The Court Should Grant Summary Judgment Regarding the Validity of the
           Asserted Patents. ................................................................................................ 12

           1.     Legal Standard for Summary Judgment of Patent Validity. .................... 13

           2.     Bayer's Patents are Presumptively Valid, and Willis Cannot Rebut
                that Statutory Presumption as a Matter of Law. ..................................... 13

      B.     The Court Should Grant Summary Judgment  on Counts I, II, and III,
           Finding Willis Infringed the Asserted Patents. ................................................... 15

           1.     Legal Standard for Summary Judgment of Infringement. ....................... 16

           2.     The Infringed Claims of the Asserted Patents. ........................................ 17

           3.     Willis Directly Infringed the '907, '861, and '888 Patents...................... 21

           4.     Willis Admittedly Infringed Bayer's Patents by Offering for Sale
                Infringing Cottonseed to Garrison Petree. ................................................ 30

      C.     The Court Should Enter a Permanent Injunction Against Willis.......................... 33

           1.     Legal Standard for Permanent Injunctions. ............................................. 33

           2.     The Court Should Grant a Permanent Injunction under the eBay
                Factors....................................................................................................... 34

D.    The Court Should Enter an Award of Damages for Bayer. ................................. 38

     1.    Legal Standard for Reasonable Royalties. ................................. 39

     2.    The Court Should Award Reasonable Royalty Damages of $17,327,358. ................................................................................. 40

E.    The Court Should Find Willis's Patent Infringement Was Willful and Intentional, and Enhance Damages. ................................................................ 41

     1.    Legal Standard for Enhanced Damages. .................................... 42

     2.    The Court Should Enhance Damages for Willis's Willful and Egregious Infringement. ........................................................... 42

VI.    CONCLUSION ............................................................................................. 44

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abbott Labs. v. Novopharm Ltd.*,
    104 F.3d 1305 (Fed. Cir. 1997)............................................................................18

*ACCO Brands, Inc. v. PC Guardian Anti-Theft Prods., Inc.*,
    592 F. Supp. 2d 1208 (N.D. Cal. 2008) ..............................................................14

*Acker v. Gen. Motors, L.L.C.*,
    853 F.3d 784 (5th Cir. 2017) ..............................................................................12

*Albritton v. Acclarent, Inc.*,
    No. 3:16-cv-03340-M, 2019 WL 13026864 (N.D. Tex. Apr. 5, 2019) .................13

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)............................................................................................12

*Avia Group Intern., Inc. v. L.A. Gear California, Inc.*,
    853 F.2d 1557 (Fed. Cir. 1988)..........................................................................15

*Bowman v. Monsanto Co.*,
    569 U.S. 278 (2013)......................................................................................37, 44

*Brilliant Instruments, Inc. v. GuideTech., LLC*,
    707 F.3d 1342 (Fed. Cir. 2013) (Dyk, J. concurring) ..........................................15

*Brunswick Corp. v. United States*,
    36 Fed. Cl. 204 (Fed. Cl. 1996) ..........................................................................39

*Celotex Corp. v. Catrell*,
    477 U.S. 317 (1986)...................................................................................*passim*

*CollegeNet, Inc. v. ApplyYourSelf, Inc.*,
    418 F.3d 1225 (Fed. Cir. 2005)..........................................................................17

*Commonwealth Sci. & Industrial Research Org. v. Buffalo Tech. Inc.*,
    492 F. Supp. 2d 600 (E.D. Tex. 2007)................................................................37

*Domestic Fabrics Corp. v. Sears, Roebuck & Co.*,
    325 F. Supp. 2d 612 (E.D.N.C. 2003)...........................................................39, 41

*eBay v. MercExchange, LLC*,
    547 U.S. 388 (2007)............................................................................................33

*Egyptian Goddess, Inc. v. Swisa, Inc.*,
543 F.3d 665 (Fed. Cir. 2008).................................................................................15

*Eli Lilly & Co. v. Barr Labs., Inc.*,
251 F.3d 955 (Fed. Cir. 2001).................................................................................13

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
318 F.Supp. 1116 (S.D.N.Y. 1970) ...................................................................39, 40

*Griffin v. United Parcel Serv., Inc.*,
661 F.3d 216 (5th Cir. 2011) ..................................................................................12

*Halo Electronics, Inc. v. Pulse Electronics, Inc.*,
579 U.S. 93 (2016)..................................................................................................42

*Hilton Davis Chemical Co. v. Warner-Jenkinson Co.*,
62 F.3d 1512 (Fed. Cir. 1995) (per curiam), *rev'd on other grounds*, 520 U.S.
17 (1997) ................................................................................................................17

*Hormone Research Found., Inc. v. Genentech, Inc.*,
904 F.2d 1558 (Fed. Cir. 1990)..............................................................................16

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995)..................................................................................16

*McCoy v. Mitsuboshi Cutlery, Inc.*,
67 F.3d 917 (Fed. Cir. 1995)..................................................................................16

*MetroPCS v. Devor*,
No. 1:15-cv-02949, 2016 WL 6133869 (N.D. Ill. October 14, 2016) ....................37

*Microsoft Corp. v. i4i Ltd. Ptshp.*,
564 U.S. 91 (2011)..................................................................................................13

*Microstrategy Inc. v. Business Objects, S.A.*,
429 F.3d 1344 (Fed. Cir. 2005)..............................................................................11

*Mobil Oil Corp. v. Amoco Chem. Corp.*,
915 F.Supp. 1333 (D. Del. 1994) ...........................................................................39

*Monsanto Co. v. Hargrove*,
No. 4:09-CV-1628 CEJ, 2011 WL 5330674 (E.D. Mo. Nov. 7, 2011) ............35, 37

*Monsanto Co. v. McFarling*,
488 F.3d 973 (Fed. Cir. 2007)................................................................................40

*Monsanto Co. v. McFarling*,
No. 4:00-CV-84 CDP, 2005 WL 1490051 (E.D. Mo. June 23, 2005) ....................37

*Monsanto Co. v. Parr*,
  545 F. Supp. 2d 836 (N.D. Ind. 2008) ........................................................35, 36, 38

*Monsanto Co. v. Ralph*,
  No. 4:00-CV-135 RWS, 2003 WL 25276984 (E.D. Mo. July 9, 2003), *vacated in part on other grounds by Monsanto Co. v. Ralph*, 382 F.3d 1374 (Fed. Cir. 2004) .......................................................................................................................37

*Monsanto Co. v. Scruggs*,
  890 F. Supp. 2d 729 (N.D. Miss. 2012) ...............................................................40

*Monsanto Prod. Supply LLC v. Rosentreter*,
  No. 3:16-cv-03038, 2017 WL 4284566 (C.D. Ill. Sept. 27, 2017) ................. *passim*

*Monsanto v. David*,
  516 F.3d 1009 (Fed. Cir. 2008) ............................................................................38

*Monsanto v. Scruggs*,
  459 F.3d 1328 (Fed. Cir. 2006) ...............................................................12, 17, 37

*Nat'l Presto Indus., Inc. v. West Bend Co.*,
  76 F.3d 1185 (Fed. Cir. 1996) ..............................................................................13

*Novozymes A/S v. Genecor Int'l, Inc.*,
  474 F. Supp. 2d 592 (D. Del. 2007) ......................................................................36

*Pharmacyclics LLC v. Cipla Ltd.*,
  No. 18-192-CFC/CJB, 2020 WL 6581643 (D. Del. Nov. 10, 2020) .....................15

*Presidio Components, Inc. v. Am. Technical Ceramics Corp.*,
  875 F.3d 1369 (Fed Cir. 2017) ..............................................................................42

*Read Corp. v. Portec, Inc.*,
  970 F.2d 816 (Fed. Cir. 1992) .........................................................................42, 44

*Rite-Hite Corp. v. Kelley Co., Inc.*,
  56 F.3d 1538 (Fed. Cir. 1995) ..............................................................................39

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
  659 F.3d 1142 (Fed. Cir. 2011) ............................................................................35

*Rotec Inds., Inc. v. Mitsubishi Corp.*,
  215 F.3d 1246 (Fed. Cir. 2000) ............................................................................30

*Stryker Corp. v. Davol, Inc.*,
  234 F.3d 1252 (Fed. Cir. 2000) ............................................................................16

*Sulzer Textile A.G. v. Picanol N.V.*,
    358 F.3d 1356 (Fed. Cir. 2004).................................................................16

*Summit 6 LLC v. HTC Corp.*,
    No. 7:14-cv-00014-O, 2015 WL 11117869 (N.D. Tex. Jan. 8, 2015)....................................14

*Summit 6, LLC v. Samsung Elecs. Co.*,
    802 F.3d 1283 (Fed. Cir. 2015).................................................................28

*WBIP, LLC v. Kohler Co.*,
    829 F.3d 1317 (Fed. Cir. 2016).................................................................42

*Wyers Prods. Group, Inc. v. Cequent Performance Prods., Inc.*,
    No. 12-cv-02640, 2015 WL 3494718 (D. Colo. Jun. 2, 2015) .............................................15

**Statutes**

35 U.S.C. § 154....................................................................................18, 20, 21

35 U.S.C. § 271......................................................................................... *passim*

35 U.S.C. § 282....................................................................................6, 12, 13

35 U.S.C. § 284....................................................................................1, 17, 39, 41

**Rules**

Fed. R. Civ. P. 56....................................................................................1, 12

Fed. R. Civ. P. 65....................................................................................38

Local Patent Rule 3-3....................................................................................14

Local Patent Rule 3-6....................................................................................14

## I.   LIVE PLEADINGS OF THE PARTIES

Pursuant to the Court's Scheduling Order (ECF No. 22 at 8), the following is a list of the live pleadings of each party:

> (1) For Plaintiffs Bayer CropScience LP and Monsanto Technology LLC, the current live pleading is Plaintiffs' Original Complaint filed March 21, 2021 (ECF No. 1); and

> (2) For Defendant Teddy Willis, the current live pleading is his Second Amended Answer filed on October 10, 2022 (ECF No. 66).

## II.   INTRODUCTION

Bayer requests the Court enter summary judgment in favor of Bayer: (1) granting judgment as a matter of law that Bayer's U.S. Patent Nos. 7,223,907 ("the '907 Patent"), 7,381,861 ("the '861 Patent"), and 8,420,888 ("the '888 Patent") (collectively, the "Asserted Patents") are valid and ruling in Bayer's favor on any affirmative defense of invalidity; (2) granting judgment as a matter of law that Willis infringed the '907, '861, and '888 Patents, as asserted in Counts I, II, and III of the Original Complaint; (3) issuing a permanent injunction enjoining Willis from making, using, saving, cleaning, delinting, planting, selling, offering to sell, importing, or otherwise transferring any cottonseed or other seed containing any of Bayer's patented biotechnologies, including those in the Asserted Patents, without Bayer's express written permission; (4) entering an award of damages of $19,062 per unit of cottonseed for the 909 infringing units sold by Willis, for a total of $17,327,358; and (5) finding that Willis's infringement was willful and egregious, and therefore enhancing damages in an amount the Court finds just up to three times, pursuant to 35 U.S.C. § 284.

Willis infringed the '907, '861 and '888 Patents by selling and offering to sell Bollgard II® XtendFlex® cottonseed without authority from Bayer. Willis has not challenged the statutorily

presumed validity of these asserted patents. No genuine issues of material fact exist with regard to the issues of the validity of the Asserted Patents, the infringement of the Asserted Patents by Willis, Bayer's entitlement to a permanent injunction and damages, and the willfulness of Willis's behavior, warranting an enhancement of damages. Summary judgment should be granted in favor of Bayer.

### III.    STATEMENT OF UNDISPUTED FACTS

**A. Bayer Patented the Bollgard II®, Roundup Ready Flex®, and Xtend Traits, and Imposes License Requirements to Use Same.**

1.      Bayer invented and developed new crop biotechnologies that involve the transfer of a gene into crop seed, such as cottonseeds, and that allow cotton plants to express a beneficial trait, such as herbicide tolerance or insect resistance. App. 97 (Declaration of Robert Nixon, at ¶ 4 ("Nixon Decl.")). At issue in this case are three patented traits in cotton plants developed by Bayer—Bollgard II® trait; Roundup Ready Flex® trait; and Xtend trait (the latter two of which are combined or stacked in XtendFlex® cotton).

#### 1.  Bayer's Patented Bollgard II® Trait.

2.      The Bollgard II® genetic trait, protected by the '907 Patent, allows a plant to resist leaf and boll-feeding larvae of moth species that damage cotton bolls and reduce yields. App. 97 (Nixon Decl. ¶ 5).

3.      The claims of the '907 Patent, among other things, are drawn to a novel transformation event of cotton plants, *Gossypium hirsutum*, in which a Deoxyribonucleic acid ("DNA") molecule having a certain nucleotide sequence was inserted into a specific site within the genome of a cotton cell, said sequence encoding a Cry2Ab lepidopteran insect inhibitory protein ("Cry2Ab protein"), as well as cotton plants and seeds derived from that transformation. App. 4, 6 ('907 Patent, at Abstract & 1:12-21). This event (named the MON15985 event) confers

2

resistance to Lepidopteran insect damage. *Id.*; App. 121 (Report of Dr. L. Curtis Hannah ("Hannah Rep."), p. 19); *see also* App. 100 (Declaration of Dr. Hannah ("Hannah Decl."), ¶¶ 2-3). A true and correct copy of the '907 Patent is included at App. 4-30.

4.      All Bollgard II® (or Bollgard 2®) and Bollgard 3® cottonseeds contain the biotechnology disclosed in the '907 Patent. App. 97 (Nixon Decl. ¶ 6).

5.      By definition, Bollgard II® and Bollgard 3® cottonseeds contain a DNA insert encoding a Cry2Ab protein. Further, Bollgard II® and Bollgard 3® cottonseeds can be identified as having nucleotide sequences of SEQ ID NO:14, SEQ ID NO:15, SEQ ID NO:16, SEQ ID NO:17 and SEQ ID NO:18. *Id.*; App. 117-118 (Hannah Rep. ¶¶ 27-28). The DNA sequences for these SEQ ID Numbers are set forth in detail in the '907 Patent. *See* App. 24-25 ('907 Patent, cols. 37-39).

6.      The '907 Patent was issued and assigned to Monsanto Technology LLC in 2007. App 4 ('907 Patent, at 1). Monsanto Technology LLC granted Bayer CropScience LP a worldwide, exclusive license to practice the inventions, to enforce the rights granted by the patent, and to grant sublicenses. App. 98 (Nixon Decl. ¶ 13).

### 2.   *Bayer's Patented Roundup Ready Flex® Trait.*

7.      The Roundup Ready Flex® genetic trait, protected by the '861 Patent, confers tolerance to glyphosate-based herbicides (such as Roundup Ultra®, Roundup UltraMAX®, Roundup WeatherMAX®, and Touchdown®), and is embodied in Roundup Ready Flex® and XtendFlex® cottonseeds. App. 97 (Nixon Decl. ¶¶ 7-9).

8.      The claims of the '861 Patent, among other things, are drawn to a transformation event of cotton plants, in which a DNA molecule having a ceratin nucleotide sequence was inserted into a specific site within the genome of a cotton cell, said sequence encoding a glyphosate tolerant 5-enol-pyruvylshikimate-3-phosphate synthase protein (EPSPS), as well as cotton plants and seeds

derived from that transformation. App. 31, 38, 43 ('861 Patent, at Abstract & 1:14-19, 11:53-55). This event (named the MON88913 event) confers tolerance to glyphosate herbicide. *Id.* A true and correct copy of the '861 Patent is included at App. 31-55.

9.      All Roundup Ready Flex® and XtendFlex® cottonseeds contain the biotechnology disclosed in the '861 Patent. App. 97 (Nixon Decl. ¶ 9).

10.     By definition, Roundup Ready Flex® and XtendFlex® cottonseeds contain a DNA insert having two sequences each encoding EPSPS, wherein the sequence overlapping the junction between the cotton genomic DNA and the 5'-end of the insert is comprised of SEQ ID NO:1, and the sequence overlapping the junction between the cotton genomic DNA and the 3'-end of the insert is comprised of SEQ ID NO:2. *Id.*; App. 122-23, 135-36 (Hannah Rep. ¶¶ 35-36, 55). The DNA sequences for SEQ ID NO:1 and NO:2 are set forth in detail in the '861 Patent. *See* App. 48 ('861 Patent, cols. 21-22).

11.     The '861 Patent was issued and assigned to Monsanto Technology LLC. App. 31 ('861 Patent, at 1). Monsanto Technology LLC granted Bayer CropScience LP a worldwide, exclusive license to practice the inventions, to enforce the rights granted by the patent, and to grant sublicenses. App. 98 (Nixon Decl. ¶ 13).

### 3. *Bayer's Patented Xtend Trait.*

12.     The Xtend genetic trait, protected by the '888 Patent, confers tolerance to dicamba-based herbicides (such as XtendiMax®), and is embodied in XtendFlex® cottonseeds. App. 98 (Nixon Decl. ¶¶ 10-11).

13.     The claims of the '888 Patent, among other things, are drawn to a novel seed, comprising an artificially inserted DNA molecule having a certain nucleotide sequence encoding a chloroplast transit peptide operably linked to a polynucleotide sequence encoding a dicamba monooxygenase protein ("DMO"), expression of which can impart tolerance to dicamba herbicide.

App. 116 (Hannah Rep. ¶ 25). A true and correct copy of the '888 Patent is included at App. 56-95.

14. All XtendFlex® cottonseeds contain the biotechnology disclosed in the '888 Patent. App. 98 (Nixon Decl. ¶ 12).

15. By definition, XtendFlex® cottonseeds contain DNA encoding a chloroplast transit peptide operably linked to DNA encoding DMO, wherein the chloroplast transit peptide encoded by the DNA comprises the amino acid sequence of SEQ ID NO:4, and the DNA encoding the chloroplast transit peptide comprises the nucleotide sequence of SEQ ID NO:15. *Id.*; App. 128-29, 135-36 (Hannah Rep. ¶¶ 44-45, 55). The amino acid sequence for SEQ ID NO:4 and the DNA sequence for SEQ ID NO:15 are both set forth in detail in the '888 Patent. App. 75, 78 ('888 Patent, cols. 29-30 & 35-36).

16. The '888 Patent was issued and assigned to Monsanto Technology LLC. App. 56 ('888 Patent, at 1). Monsanto Technology LLC granted Bayer CropScience LP a worldwide, exclusive license to practice the inventions, to enforce the rights granted by the patent, and to grant sublicenses. App. 98 (Nixon Decl. ¶ 13).

### 4. Bayer's License Requirements for the Bollgard II®, Roundup Ready Flex®, and Xtend Traits.

17. Bayer markets Bollgard II®, Bollgard 3®, Roundup Ready Flex®, and XtendFlex® cottonseeds under its own brands (such as Deltapine®). Bayer also licenses other seed companies to insert the traits into their own seed varieties and market Bollgard II®, Bollgard 3®, Roundup Ready Flex®, and XtendFlex® cottonseeds under their brands. App. 98 (Nixon Decl. ¶ 14).

18.     All Bollgard II®, Bollgard 3®, Roundup Ready Flex®, and XtendFlex® cottonseed has been sold to growers pursuant to a limited use license since these crop seeds were introduced into the market. App. 98-99 (Nixon Decl. ¶ 15).

19.     All growers have been required to enter into a limited use license agreement (a "Technology Stewardship Agreement" or "TSA") to use seed containing the Bollgard II®, Roundup Ready Flex®, and Xtend traits. *Id.* The TSA permits the grower to use the seed to produce a "single commercial crop." *Id.* The TSA explicitly prohibits the purchaser from supplying the seed to any other person or entity for the purpose of planting, and from saving harvested seed for use as planting seed for a subsequent crop. *Id.* The TSA prohibits the use of subsequent generations of the seed for replanting as each new generation of seed contains Bayer's patented genetic traits. *Id.*

20.     Bayer has never authorized growers to plant cottonseeds containing the Bollgard II®, Roundup Ready Flex®, and Xtend traits that were obtained without a valid license agreement and from an unauthorized dealer. App. 98-99 (Nixon Decl. ¶ 15). Willis is not an authorized dealer or seller of Bayer's cottonseed. App. 278 (Willis Tr. 97:19-21).

**B.  The Asserted Patents are Valid.**

21.     Willis asserted an affirmative defense of invalidity in his original answer. ECF No. 17 at 6. But Willis removed this defense in his Second Amended Answer. ECF No. 66 at 10.

22.     The patents-in-suit are presumed valid by statute. *See* 35 U.S.C. § 282(a).

23.     Willis served no infringement contentions and designated no expert regarding invalidity in this action, despite the deadlines for doing so having already passed.

**C.  Willis Received Bayer-Traited Cottonseed from Caswell.**

24.     After cotton is harvested, it is sent to a cotton gin, which separates the cotton lint from the cottonseed; that process, however, "leaves the seed in a fuzzy state." App. 252

(Deposition Transcript of Matt Caswell ("Caswell Tr.") at 23:17-22). A "delinting facility is where the fuzz is removed from the cottonseed" using an "acid to wash the fuzz off" so the seed can be planted with modern planting equipment. App. 252-53 (Caswell Tr. 23:25-24:5). Defendant Willis owns a "delinting" facility in Slaton, Texas. App. 270-71 (Deposition Transcript of Defendant Teddy Willis ("Willis Tr.") at 26:23-27:2); *see also* App. 273-76 (Willis Tr. 63:3-66:13) (Willis describing his delinting process).

25.     Lubbock Cotton Growers, a cotton gin, delivered cottonseed from a cotton farmer, Matt Caswell ("Caswell"), to Willis's facility in two different loads, each load being a different variety of cotton. App. 279-84, 301 (Willis Tr. 110:6-113:25, 114:15-23, 117:7-9 & 165:4-7). Caswell informed Willis that the loads were Deltapine® 1820 and Deltapine® 1646 cottonseed. App. 290-91 (Willis Tr. 131:21-132:14); *see also* App. 249-50 (Caswell. Tr. 18:8-19:9). Deltapine® 1820 and Deltapine® 1646 contain the Bollgard II®, Roundup Ready Flex® and Xtend traits. App. 97-98 (Nixon Decl. ¶¶ 6, 9, 12, 14, 16). The seed Willis received from Caswell was "fuzzy" cottonseed that Caswell had grown from a crop, and that Willis later delinted (*i.e.*, removed remaining cotton lint using his acid-wash process). App. 272-76, 290-91 (Willis Tr. 62:20-66:17 & 131:21-132:9). This seed is referred herein as the "Caswell Cottonseed."

**D.  Willis Sold and Offered to Sell the Caswell Cottonseed, Containing Bayer's Patented Bollgard II®, Roundup Ready Flex®, and Xtend Traits.**

26.     Willis sold and offered for sale the Caswell Cottonseed, which contains Bayer's patented traits, despite knowing this was "not legal" since he was "not an authorized dealer." App. 278 (Willis Tr. 97:8-21).

27.     In particular, Willis sold Caswell Cottonseed to Brad Williams ("Williams") in O'Donnell, Texas on at least five different occasions. App. 322-23 (Deposition Transcript of Brad Johnson ("Johnson Tr."), at 69:16-70:25). For these sales, Willis used an intermediary, Brad

Johnson ("Johnson"), who is not a cotton farmer and has no experience with and does not know anything about cottonseed varieties and pricing. App. 309-10, 316-17 (Johnson Tr. 12:15-13:3; 47:13-48:13). For each sale, Johnson would bring his truck and trailer to Willis's facility, and "Teddy [Willis] or one of his hands loaded" the cottonseed into the trailer. App. 318-20, 327 (Johnson Tr. 53:16-55:5 & 122:7-13). After delivering the cotton seed, Williams would then give Johnson a check; Johnson would cash that check, and then write a new check to Willis for that money minus an amount for his hauling services. App. 323, 326 (Johnson Tr. 70:1-21 & 92:13-21); App. 294-300 (Willis Tr. 147:22-148:19 & 154:3-158:19) (Willis agreeing that Johnson gave him the money for the one sale Bayer was aware of at the time of this deposition); App. 406-08 (Declaration of Brad Johnson ("Johnson Decl.") at ¶¶ 3-11).

28.      Bank records and testimony from Johnson and Williams establish there were at least five different sales of Caswell Cottonseed, for which Williams paid a total of $181,800. App. 311-12, 321, 323-24 (Johnson Tr. 31:16-32:6, 59:11-15 & 70:18-71:10); App. 387-91 (images of the five checks written by Williams); App. 377 (affidavit from Centennial Bank's Custodian of Records testifying that the check images were kept in the ordinary course of its business); App. 348-49, 351-63, 366-70 (Deposition Transcript of Brad Williams ("Williams Tr.") at 45:5-46:5, 53:1-22, 55:19-62:6, 64:16-67:2, 80:24-84:6) (confirming that each of the checks was for the purchase of traited seed); App. 406-08 (Johnson Decl. ¶¶ 3-11). The price for the cottonseed was $200 per bag. App. 294-300 (Willis Tr. 147:22-148:19 & 154:3-158:19); App. 99 (Nixon Decl. ¶ 17); App. 350 (Williams Tr. 48:21-25); App. 407 (Johnson Decl. ¶ 5). As such, 909 units (bags) of seed were sold (*i.e.*, $181,800 divided by $200).

29.      Bank records further establish that Johnson in turn wrote Willis five different checks for each of the sales of Caswell Cottonseed to Williams. App. 415-19 (five checks); App.

407-08 (Johnson Decl. ¶¶ 5-9). In total, Willis received at least $164,820 from those checks for the sales of cottonseed to Williams. App. 408 (Johnson Decl. ¶ 11). [1]

30.     Willis also offered cottonseed for sale to Garrison Petree ("Petree"), and was recorded doing so in audio. App. 393 (native audio recording); App. 394-400 (transcript of recording); *see* App. 392 (Declaration of Judy Corrado ("Corrado Decl.")) (testifying that this is a true-and-accurate transcription of the audio recording); App. 285-87 (Willis Tr. 123:12-20 & 124:22-125:2).

31.     To Petree, Willis offered for sale varieties of Deltapine® cottonseed that contain the patented Bollgard II®, Roundup Ready Flex® and Xtend traits, specifically at least a total of 108 bags, with each bag at the price of $150. App. 393 (audio recording); App. 394-96 (Transcript at 1-3); App. 97-99 (Nixon Decl. ¶¶ 6, 9, 12, 16); App. 230-42 (Hannah Rep., Ex. 4).

32.     Willis also told Petree that he would have available for sale in the future additional bags and/or varieties of Deltapine® cottonseed, which also would contain the patented Bollgard II®, Roundup Ready Flex® and Xtend traits. App. 393 (audio recording); App. 395, 397-98 (Transcript at 2, 4-5); App. 97-99 (Nixon Decl. ¶¶ 6, 9, 12, 16); *see also* App. 136, 230-42 (Hannah Rep., ¶ 58 & Ex. 4).

33.     Willis admits offering this Deltapine® cottonseed for sale to Petree. App. 277-78, 285-87, 292-93 (Willis Tr. 96:9-17, 97:2-5, 123:21-124:2, 125:15-25 & 142:21-143:17). Willis also admits that he offered for sale the Caswell Cottonseed to Petree. App. 288-89 (Willis Tr. 128:15-129:3).

---

[1] The deposition of Brad Williams indicates that there was also a sixth cash-transaction sale to Williams for $15,000. Bayer reserves the right to request damages for this sale to the extent trial is required, but for purposes of summary judgment is limiting its request to the five sales for which there is documentary evidence in the form of checks.

**E. The Caswell Cottonseed, Collected from Williams, Meets Every Limitation of the Asserted Patents.**

34.  The Caswell Cottonseed sold and transferred to Williams was inspected by Mid-South Ag Research, Inc. App. 401-03 (Declaration of Dr. Kenneth Savage ("Savage Decl.") at ¶¶ 3-9). In particular, Dr. Savage inspected the crop remaining from three of Williams's 2020 cotton fields and collected samples of the cotton crop. *Id.* In addition, Dr. Savage collected samples from a bulk, unplanted cottonseed lot at Williams's farm shop. *See* App. 401-02 (Savage Decl. ¶¶ 3-4 & 7). These cottonseed samples were ginned, delinted (where necessary), prepared for testing, and sent to a laboratory for testing. App. 402-03 (Savage Decl. ¶¶ 8-9); App. 404-05 (Declaration of Aaron Powers ("Powers Decl.") at ¶¶ 3-6).

35.  The Caswell Cottonseed collected from three of Williams's cotton fields and a bulk seed lot were analyzed by three categories of laboratory tests: (1) lateral flow protein testing, (2) polymerase chain reaction ("PCR") testing, and (3) DNA sequencing, to determine whether the patented Bollgard II®, Roundup Ready Flex®, and Xtend traits were present in those samples. App. 104-05, 110-15 (Hannah Rep. ¶¶ 3, 15-24).

36.  Lateral flow protein testing detected the following proteins recited in the patents-in-suit in the Caswell Cottonseed: Cry2Ab for the '907 Patent, EPSPS for the '861 Patent, and DMO for the '888 Patent. App. 112 (Hannah Rep. ¶ 18).

37.  PCR testing determined that specific unique segments of DNA (*i.e.*, marker sequences), as recited in the asserted claims, were present in the Caswell Cottonseed—specifically, SEQ ID NO:17 (for the '907 Patent), SEQ ID NO:2 (for the '861 Patent), and SEQ ID NO:15 (for the '888 Patent). App. 112-14, 118-19, 125-26, 130-32 (Hannah Rep. ¶¶ 19-20, 31, 40, 49).

38.     PCR testing also detected the presence of a DNA insert having two sequences, each encoding EPSPS, as recited by the '861 Patent. App. 54 ('861 Patent, Claim 2); App. 114, 123-25 (Hannah Rep. ¶¶ 22, 39).

39.     DNA sequencing established that the Caswell Cottonseed contains each of the recited sequences in the asserted claims of the patents-in-suit—specifically, SEQ ID NOs: 14, 15, 16, 17 and 18 of the '907 patent, SEQ ID NOs: 1 and 2 of the '861 patent, and SEQ ID NO: 15, as well as a portion of the attached gene encoding dicamba monooxygenase, of the '888 patent, showing that the sequences are operably linked. App. 114-15, 119-20, 126-27, 132-33 (Hannah Rep. ¶¶ 23, 32, 41, 50).

40.     Moreover, Williams sprayed both dicamba and Roundup (*i.e.*, glyphosate) herbicides on his cotton crop, from the Caswell Cottonseed he purchased from Willis, and no herbicide or insect injury occurred to the cotton. App. 361-363 (Williams Tr. 65:1-67:21). Had non-Bollgard II® XtendFlex® cottonseed been planted, there would have been injury to the cotton. *Id.*

41.     As such, Willis infringed the Asserted Patents by selling and offering for sale the Caswell Cottonseed.

## IV.    LEGAL STANDARD

Summary judgment is an essential tool of the district courts, aimed at resolving actions justly and efficiently. *Celotex Corp. v. Catrell*, 477 U.S. 317, 327 (1986). Although this case involves claims of patent infringement, the summary judgment standards of the Fifth Circuit apply with equal force. *See Microstrategy Inc. v. Business Objects, S.A.*, 429 F.3d 1344, 1348-49 (Fed. Cir. 2005).

Summary judgment is appropriate if, considering all reasonable inferences from the evidence in the light most favorable to the non-moving party, there is no genuine issue as to any

material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 221 (5th Cir. 2011). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Only factual disputes that may affect the outcome of the case will preclude entry of summary judgment. *Id.* at 248. Thus, the non-moving party must come forward with evidence disputing specific facts which would affect the outcome of the case. *Celotex Corp.*, 477 U.S. at 322-24.

The non-moving party may not rest upon mere allegations or denials of the moving party's pleading, but must set forth specific facts showing that there is a genuine issue for trial. *Id.* at 324-25; Fed. R. Civ. P. 56(e). While the court must make all reasonable inferences in favor of the non-moving party in considering summary judgment, it must do so without speculation. "Summary judgment cannot be defeated through '[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation.'" *Acker v. Gen. Motors, L.L.C.*, 853 F.3d 784, 788 (5th Cir. 2017) (alteration in original) (quoting *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002)). "With regard to 'materiality,' only those disputes over facts that might affect the outcome of the lawsuit under the governing substantive law will preclude summary judgment." *Monsanto v. Scruggs*, 459 F.3d 1328, 1334 (Fed. Cir. 2006) (quoting *Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 272 (5th Cir. 1987)).

## V.   ARGUMENT AND AUTHORITIES

### A.  The Court Should Grant Summary Judgment Regarding the Validity of the Asserted Patents.

Here, Bayer has asserted three patents—the '907, '861 and '888 Patents.  *See* ECF No. 1 ¶¶ 9-11. Each of these patents is statutorily presumed valid. *See* 35 U.S.C. § 282(a) ("A patent

shall be presumed valid."). The defendant, therefore, has the "burden of establishing invalidity of a patent or any claim thereof" with "clear and convincing evidence." *Id.*; *Microsoft Corp. v. i4i Ltd. Ptshp.*, 564 U.S. 91, 95 (2011). Willis cannot meet that burden as a matter of law. He no longer asserts an affirmative defense of invalidity and has put forth no evidence of invalidity, including not making required disclosures or designating an expert. The Court, therefore, should grant summary judgment in favor of Bayer on the validity of the Asserted Patents, including any affirmative defense of invalidity.

### 1. *Legal Standard for Summary Judgment of Patent Validity.*

"In deciding a motion for summary judgment" regarding patent validity "the burden of proof must be considered." *Nat'l Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1189 (Fed. Cir. 1996); *see also Celotex*, 477 U.S. at 325 ("the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case"). Accordingly, a patent owner is entitled to summary judgment of validity if it shows that the accused infringer, who bears the burden of proof of invalidity at trial, has not demonstrated clear and convincing evidence on any requirement of the invalidity defense. *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001).

### 2. *Bayer's Patents are Presumptively Valid, and Willis Cannot Rebut that Statutory Presumption as a Matter of Law.*

Willis has offered no evidence or argument in this case to carry his high burden of proving that the asserted claims of the '907, '861 and '888 Patents are invalid. ECF No. 17 at 6. Further, Willis has waived the affirmative defense of invalidity.

At the beginning of this case, the Court notified the parties that they "should comport their disclosures and filings with the requirements of N.D. Tex. Misc. Order No. 62" (*i.e.*, the "Local Patent Rules" or "LPR"). ECF No. 19 at 4 n.1; *see also Albritton v. Acclarent, Inc.*, No. 3:16-cv-

03340-M, 2019 WL 13026864, at *1 (N.D. Tex. Apr. 5, 2019) (referring to the "Local Patent Rules"). The Local Patent Rules set forth a process of serving infringement and invalidity contentions, which have a purpose to "streamline the discovery process by narrowing the issues for claim construction and trial." *Summit 6 LLC v. HTC Corp.*, No. 7:14-cv-00014-O, 2015 WL 11117869, at *1 (N.D. Tex. Jan. 8, 2015). The Scheduling Order sets forth Local Patent Rule deadlines—in particular, ordering Willis to serve his "preliminary invalidity contentions" by October 4, 2021. ECF No. 22 at 1, 3; LPR 3-3. The Court further ordered Willis to serve any "final invalidity contentions" and extended that deadline to July 8, 2022. ECF No. 22 at 5; ECF No. 29 at 2; *see also* LPR 3-6. Willis served neither preliminary nor final invalidity contentions by those deadlines. Indeed, to date, Willis has served no invalidity contentions and has not attempted to move the Court to allow him to serve such contentions out of time.

The Scheduling Order also sets forth a deadline for the "Designation of Expert Witnesses on Non-Construction Issues," ordering the parties to designate their experts on each issue for which they have the burden of proof, and that deadline was extended to June 24, 2022. ECF No. 22 at 1, 5-6; ECF No. 29 at 2. Willis also did not designate any expert for invalidity, an issue for which he bears the burden of proof, by the deadline or to the present date, and he has not attempted to move the Court for leave to designate an expert out of time.

Finally, while still represented by his now-withdrawn counsel, Willis served a Second Amended Answer on October 12, 2022, which omits an affirmative defense of invalidity. ECF No. 66 at 10. Thus, Willis intentionally waived validity as an issue in this case.

On this record, summary judgment that the Asserted Patents are valid should be entered. *See ACCO Brands, Inc. v. PC Guardian Anti-Theft Prods., Inc.*, 592 F. Supp. 2d 1208, 1215-16 (N.D. Cal. 2008) (granting summary judgment of validity given defendant's failure to serve

invalidity contentions); *Pharmacyclics LLC v. Cipla Ltd.*, No. 18-192-CFC/CJB, 2020 WL 6581643, at *2-3 (D. Del. Nov. 10, 2020) (finding that invalidity arguments not disclosed in contentions and raised on the eve of trial were waived); *Wyers Prods. Group, Inc. v. Cequent Performance Prods., Inc.*, No. 12-cv-02640, 2015 WL 3494718, at *2 (D. Colo. Jun. 2, 2015) (finding invalidity arguments not in contentions either waived or forfeited); *Avia Group Intern., Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1562 (Fed. Cir. 1988) (citing *Roper Corp. v. Litton Sys., Inc.*, 757 F.2d 1266, 1270 (Fed. Cir. 1985)) ("'[A] challenger's silence leaves untouched at this stage what the statute presumes, namely that [the] patent is valid.'"), *abrogated on other grounds by Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008). In similar circumstances, the Supreme Court in *Celotex* stated that "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." 477 U.S. at 322-323. By demonstrating an absence of evidence on the issue of invalidity, an issue on which Willis bears the burden of proof, Bayer has discharged its burden of proving that summary judgment is appropriate. *See Brilliant Instruments, Inc. v. GuideTech., LLC*, 707 F.3d 1342, 1350 (Fed. Cir. 2013) (Dyk, J. concurring) (a party moving for summary judgment on an issue as to which the nonmoving party bears the burden of proof discharges its initial burden by pointing out to the district court the absence of evidence supporting the nonmoving party's case.).

### B. The Court Should Grant Summary Judgment on Counts I, II, and III, Finding Willis Infringed the Asserted Patents.

Willis directly infringed as a matter of law the three asserted Bayer patents—the '907, '861, and '888 Patents—by selling and offering for sale Bollgard II® XtendFlex® cottonseed. Indeed, Willis admits to offering for sale the infringing cottonseed, and the undisputed facts show that he sold the same cottonseed. The Court, therefore, should also grant summary judgment on

Counts I, II, and III of the Original Complaint, finding that Willis infringed each of the Asserted Patents.

### 1. Legal Standard for Summary Judgment of Infringement.

A patent is infringed whenever a person "without authority makes, uses, offers to sell or sells any patented invention within the United States or imports into the United States any patented invention during the term of the patent therefor." 35 U.S.C. § 271(a).[2] Federal Circuit law governs issues of patent infringement. *See Sulzer Textile A.G. v. Picanol N.V.*, 358 F.3d 1356, 1363 (Fed. Cir. 2004).

Determining whether an infringement has occurred is a two-step process. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995). "The first step is determining the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device accused of infringing." *Id.* (internal citations omitted). Claim construction is exclusively a matter of law, determined by the court upon consideration of the claims themselves, the specification, and the prosecution history. *Id.* at 979. The second step, referred to as infringement analysis, is a question of fact. *Stryker Corp. v. Davol, Inc.*, 234 F.3d 1252, 1258 (Fed. Cir. 2000). Literal infringement occurs where each of the limitations in the patent claims asserted are contained in the accused device or product (*i.e.*, cottonseed in this case). *Hormone Research Found., Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1562 (Fed. Cir. 1990);

---

[2] The patentee does not have the burden to establish that the accused acts occurred "without authority." Instead, the infringer bears the burden to prove as an affirmative defense that the infringing acts occurred with authority. *See McCoy v. Mitsuboshi Cutlery, Inc.*, 67 F.3d 917, 920 (Fed. Cir. 1995) ("A licensee, of course, has an affirmative defense to a claim of patent infringement."). Regardless, Willis was not authorized to practice Bayer's patents, admits such, and did not raise this as an affirmative defense. *See* App. 278 (Willis Tr. 97:19-21); ECF No. 17 at 6-7; ECF No. 66 at 10-11.

*Scruggs*, 459 F.3d at 1334. A patent is infringed if a single claim is infringed. *CollegeNet, Inc. v. ApplyYourSelf, Inc.*, 418 F.3d 1225, 1236 (Fed. Cir. 2005).

Here, as discussed below, there is no dispute as to the meaning and scope of Bayer's patents, or that the seeds sold by Willis and found in his customer's fields contain Bayer's patented technologies.

The intent or knowledge of the accused infringer is not relevant to the determination of infringement. *Hilton Davis Chemical Co. v. Warner-Jenkinson Co.*, 62 F.3d 1512, 1519 (Fed. Cir. 1995) (per curiam), *rev'd on other grounds*, 520 U.S. 17 (1997). "A patent owner may exclude others from practicing the claimed invention, regardless of whether infringers even know of the patent." *Id.* The "question [of infringement] is one irrespective of motive. The defendant may have infringed without intending, or even knowing it; but he is not, on that account, the less an infringer." *Id.* (quoting *Parker v. Hulme*, 18 F. Cas. 1138, 1143 (C.C.E.D. Pa. 1849) (internal quotations omitted)). Quite simply, infringement is a strict-liability offense, and a court must award damages adequate to compensate for the infringement, regardless of the intent, culpability, or motivation of the infringer. *Id.* at 1527; 35 U.S.C. § 284.

### 2. *The Infringed Claims of the Asserted Patents.*

#### a. The '907 Patent and its Asserted Claims.

Willis's activities directly infringed Claim 9 (based on Claim 2) of the '907 Patent. Those claims are as follows:

> **Claim 2** - An insect resistant cotton plant, comprising incorporated into the plant's genome an insert DNA encoding Cry2Ab and DNA having nucleotide sequences of SEQ ID NO:14, SEQ ID NO:15, SEQ ID NO:16, SEQ ID NO:17 and SEQ ID NO:18.

> **Claim 9** - A transgenic seed of the plant of claim 2, wherein said seed comprises said nucleotide sequences.

App. 29 ('907 Patent, 47:41-45, 48:41-42).

Claim 9 is the asserted claim for the '907 Patent in this action. It recites a "transgenic seed" (*i.e.*, cottonseed) of the plant of Claim 2, which contains the nucleotide sequences listed in Claim 2. A "transgenic seed" refers to a seed that "contains artificially introduced genetic material from a different organism, and includes subsequent generations of seed that contain the introduced genetic material." App. 121 (Hannah Rep., p. 19); App. 101 (Hannah Decl. ¶ 5). A "plant's genome" is all of the genetic information of the plant, and "nucleotides" are organic molecules that can be considered the building blocks of genetic material such as DNA. App. 101 (Hannah Decl. ¶¶ 5-6). A "nucleotide sequence" refers to the identity and order of nucleotides in a string of attached nucleotides (i.e., a "polynucleotide"). App. 101 (Hannah Decl. ¶ 6). DNA is made up of four nucleotides represented by the letters A, T, G and C that stand for: adenine (A), thymine (T), guanine (G), and cytosine (C). App. 101-02 (Hannah Decl. ¶¶ 6-7).

Claim 2 references five different nucleotide sequences (SEQ ID NO:14, SEQ ID NO:15, SEQ ID NO:16, SEQ ID NO:17, and SEQ ID NO:18), which are found in the '907 Patent at columns 37 through 40. *See* App. 24-25. Claim 2 is drawn to a cotton plant, having incorporated into the plant's genome an insert DNA encoding a Cry2Ab protein, and DNA having the nucleotide sequences identified above (i.e., SEQ ID NO:14, SEQ ID NO:15, SEQ ID NO:16, SEQ ID NO:17, and SEQ ID NO:18). Cry2Ab is an insect inhibitory protein that specifically targets Lepidopteran insects. App. 4, 6 ('907 Patent, Abstract & 1:17-18). All Bollgard II® and Bollgard 3® cottonseeds contain DNA that encodes the Cry2Ab protein as well as the sequences recited in Claim 2 of the '907 Patent. App. 97 (Nixon Decl. ¶ 6); App. 117-18, 135-36 (Hannah Rep ¶¶ 27-28, 55-56).

The '907 Patent was filed after June 8, 1995, and so expires 20 years from its earliest non-provisional priority date. 35 U.S.C. § 154(a)(2) & (a)(3); *see also Abbott Labs. v. Novopharm Ltd.*, 104 F.3d 1305, 1307-08 (Fed. Cir. 1997) (expiration date of a patent is a matter of law). As the

patent claims priority to an international application filed on June 5, 2002, it expired approximately

June 5, 2022. App. 4 ('907 Patent, at 1). The infringing conduct at-issue in this lawsuit, however,

occurred in 2020, *i.e.*, prior to the expiration in 2022.

### b. The '861 Patent and its Asserted Claims.

Willis's activities directly infringed Claim 2 of the '861 Patent, which is as follows:

**Claim 2** – A glyphosate tolerant cotton plant, or DNA-containing part thereof, comprising incorporated into the plant's genome a DNA insert having two sequences each encoding EPSPS, wherein the sequence overlapping the junction between the cotton genomic DNA and the 5'-end of the insert is comprised of SEQ ID NO:1, and the sequence overlapping the junction between the cotton genomic DNA and the 3'-end of the insert is comprised of SEQ ID NO:2.

App. 54 ('861 Patent, 33:35-42).

Claim 2 is the asserted claim for the '861 Patent in this action. Claim 2 is drawn to a cotton

plant or a "DNA-containing part thereof," such as a cottonseed. *Id.* The claim recites a DNA insert

incorporated into the genome of the plant, wherein the DNA insert has two sequences, each

encoding the enzyme "5-enol-pyruvylshikimate-3-phosphate synthase" (*i.e.*, EPSPS). App. 41

('861 Patent, 7:31-32). A "plant's genome" is all of the genetic information of the plant. App. 101

(Hannah Decl. ¶ 5). As the '861 Patent specification explains, the herbicide "[g]lyphosate inhibits"

EPSPS naturally "found in plants," and inhibition of the EPSPS enzyme activity can harm or kill a

plant. App. 40, 43 ('861 Patent, 5:14-21 & 11:20-22). Protection from glyphosate's harmful effects,

*i.e.*, glyphosate tolerance, however, "can be achieved by the expression of bacterial EPSPS variants

and plant EPSPS variants that have lower affinity for glyphosate and therefore retain their catalytic

activity in the presence of glyphosate," such as the "glyphosate tolerant" EPSPS from

"*Agrobacterium* sp. Strain CP4." *Id.* Claim 2 also references two nucleotide sequences (SEQ ID

NO:1 and NO:2), which are found in the '861 Patent, at columns 21 through 22, and recites their

location (*i.e.*, overlapping the junctions of the cotton genomic DNA and the 3'-end or the 5'-end).

*See* App. 48 ('861 Patent, cols 21-22); App. 101-02 (Hannah Decl. ¶ 7 (explaining the meaning of "5'-end" and "3'-end" for DNA)). All Roundup Ready Flex® and XtendFlex® cottonseeds contain a DNA insert with two sequences, each encoding the EPSPS protein, as well as the nucleotide sequences SEQ ID NO:1 and SEQ ID NO:2 at the cotton genomic DNA/DNA insert junctions as recited in Claim 2 of the '861 Patent. App. 97 (Nixon Decl. ¶ 9); App. 122-23, 135-36 (Hannah Rep. ¶¶ 35-36, 55).

The '861 Patent was filed after June 8, 1995, and so expires 20 years from its earliest non-provisional priority date. 35 U.S.C. § 154(a)(2) & (a)(3). As the patent claims priority to an international application filed on February 2, 2004, it will expire approximately February 2, 2024. App. 31 ('861 Patent, at 1).

### c.  The '888 Patent and its Asserted Claims.

Willis's activities directly infringed Claims 31 and 32 of the '888 Patent, which is as follows:

> **Claim 31 –** A dicamba tolerant seed for providing protection against pre-emergence application of dicamba comprising a DNA encoding a chloroplast transit peptide operably linked to a DNA encoding dicamba monooxygenase, wherein the DNA encodes a chloroplast transit peptide comprising SEQ ID NO: 4.

> **Claim 32 –** The dicamba tolerant seed of claim 31, wherein the DNA encoding the chloroplast transit peptide comprises SEQ ID NO: 15.

App. 94-95 ('888 Patent, 68:66-69:7).

Claims 31 and 32 are the asserted claims for the '888 Patent in this action. The claims are drawn to a "dicamba tolerant seed," such as cottonseed, "for providing protection against pre-emergence application of dicamba." *Id.* Dicamba is a herbicide used to control weeds but can also cause harm to crop plants such as cotton. App. 61 ('888 Patent, 1:22-24). Claim 31 recites that the seed comprises DNA encoding a "chloroplast transit peptide operably linked to a DNA encoding dicamba monooxygenase." App. 95 ('888 Patent, 69:1-2). As the patent explains, dicamba

monooxygenase (or DMO) "catalyzes the degradation of the herbicide dicamba" to a "non-toxic" acid "in plants, thus conferring herbicide tolerance." App. 61 ('888 Patent, 1:22-25). For the DMO protein to function effectively in plant cells once it is produced, it must make its way into a structure within the plant cell called the "chloroplast." App. 107-08 (Hannah Rep. ¶ 11). The DMO protein is able to make its way into the chloroplast, *i.e.*, to "traverse the membrane of the chloroplast," by linking to a "chloroplast transit peptide." *Id.*

Claim 31 states that the chloroplast transit peptide comprises the amino acid sequence of SEQ ID NO: 4, which is found in the '888 Patent, at columns 29 through 30. *See* App. 75. Claim 32 recites the dicamba tolerant seed of claim 31, but further sets forth the nucleotide sequence of the DNA encoding the chloroplast transit peptide. In particular, claim 32 recites that this DNA comprises the nucleotide sequence of SEQ ID NO:15, which is a sequence set forth in the '888 Patent, at columns 35 through 36. *See* App. 78. The DNA sequence of SEQ ID NO:15 "encodes for" or "translates into" (as a matter of molecular biology via the genetic code) the amino acid sequence of SEQ ID NO:4. App. 134 (Hannah Rep, p. 32).

The '888 Patent was filed after June 8, 1995, and so expires 20 years from its earliest non-provisional priority date. 35 U.S.C. § 154(a)(2) & (a)(3). As the patent claims priority back to an application filed on June 5, 2007, it will expire approximately June 5, 2027. App. 56 ('888 Patent, at 1).

### 3. *Willis Directly Infringed the '907, '861, and '888 Patents.*

#### a. <u>The Caswell Cottonseed.</u>

Willis testified that Lubbock Cotton Growers, a co-op gin, delivered to him cottonseed from Matt Caswell ("<u>Caswell</u>"). App. 279-82 (Willis Tr. 110:6-113:25). This cottonseed was delivered to Willis's facility in two different loads, with each load containing a different variety of cotton. App. 283-84 (Willis Tr. 114:15-23 & 117:7-9). Caswell later told Willis that the varieties

were "Delta Pine 1820" and "Delta Pine 1646." App. 290-91 (Willis Tr. 131:21-132:14). Deltapine® 1820 is "Bollgard® 3 XtendFlex®" cotton and Deltapine® 1646 is "Bollgard II® XtendFlex®" cotton. App. 135-36, 230-42 (Hannah Rep. ¶¶ 55, 57 & Ex. 4 thereto); App. 99 (Nixon Decl. ¶ 16). Bollgard® 3 cotton contains the Bollgard II® trait (as well as a newer trait not at issue here). App. 97 (Nixon Decl. ¶ 6).

### b. __Willis Sold 909 Units or Bags of the Caswell Cottonseed to Brad Williams.__

Willis sold the Caswell Cottonseed, which infringes Bayer's patents, on at least five different occasions, as testified to by Brad Johnson and established by the evidentiary records (including images of checks for the sales). *See*, *e.g.*, App. 322-23 (Johnson Tr. 69:16-70:10). Johnson, an acquaintance of Willis, has first-hand knowledge of these sales because he was used to deliver or haul the Caswell Cottonseed from Willis to Williams. For each sale, Johnson would bring his truck and trailer to Willis's facility, and "Teddy [Willis] or one of his hands loaded" the cottonseed into the trailer. App. 318-20, 327 (Johnson Tr. 53:16-55:5 & 122:7-13). After delivering the cottonseed, Williams would then give Johnson a check; Johnson would deposit that check, and then write a new check to Willis for that money minus an amount for Johnson's hauling services. App. 323, 326 (Johnson Tr. 70:1-21 & 92:13-21); App. 406-08 (Johnson Decl. ¶¶ 3-9).

Johnson testified there were multiple different sales in which he delivered cottonseed to Williams, and that each time Williams gave him a separate check for the purchase. App. 311-12, 321, 323-24 (Johnson Tr. 31:16-32:6, 59:11-15 & 70:18-71:10); App. 407-08 (Johnson Decl. ¶¶ 5-9). Bank records from Centennial Bank establish that there were at least a total of five different sales with five different checks. *See* App. 387-391 (images of the five checks written by Williams); App. 377 (affidavit from Centennial Bank's Custodian of Records testifying that the check images were kept in the ordinary course of its business). Willis acknowledged that four mini-bulks of Caswell Cottonseed from his facility were transferred to Williams in return for $32,000, and that

he received approximately $30,000 of that amount. App. 294-300 (Willis Tr. 147:22-148:19 &
154:3-158:19). As a mini-bulk is equivalent to 40 bags/units, this amounted to a sale price of $200
per bag. App. 99 (Nixon Decl. ¶ 17). Williams, at his deposition, confirmed that he paid $200 per
bag, and Johnson further confirmed that amount. App. 350 (Williams Tr. 48:21-25); App. 407
(Johnson Decl. ¶ 5).

For the five sales, Williams paid the following amounts by check on the following days:
(1) $67,600 (May 3, 2020); (2) $33,200 (May 9, 2020); (3) $32,000 (May 20, 2020); (4) $33,000
(May 29, 2020); and (5) $16,000 (June 1, 2020), for a total of $181,800. *See* App. 387-91 (checks
from Centennial bank); App. 377 (affidavit from Centennial Bank's Custodian of Records); App.
348-49, 351, 352-59, 361-363 (Williams Tr. 45:5-46:5, 53:1-22, 55:19-62:6 & 64:16-67:2)
(confirming that each of the checks was for the purchase of traited seed); App. 407-08 (Johnson
Decl. ¶¶ 5-9) (describing each of the checks). At $200 per bag/unit, Willis therefore sold Williams
909 bags (or units).[3]

Bank records from Peoples Bank in Lubbock, Texas further confirm Brad Johnson's
testimony that he wrote checks to Willis after he delivered cottonseed to Williams and was paid
by Williams. Johnson paid Willis the following amounts by checks that were cashed on the
following days: (1) $57,500 (May 4, 2020); (2) $28,220 (May 11, 2020); (3) $27,200 (May 20,
2020); (4) $38,300 (May 29, 2020); and (5) $13,600 (June 2, 2020). App. 415-19 (five checks);
App. 407-08 (Johnson Decl. ¶¶ 5-9) (describing the five checks attached to his declaration). This

---

[3] Bayer is giving the benefit of every doubt to Willis by asserting that he sold only 909 bags. In
fact, it was likely more. In addition to not requesting damages for the sixth cash transaction that is
supported by deposition testimony, legitimate cottonseed is sold by seed count. App. 371-72
(Williams Tr. 86:16-87:25). A bag of Deltapine cottonseed varies in weight, but while it is
sometimes less than 50 pounds, it is typically not more. *Id.* Williams, however, paid for the
cottonseed based on the assumption that one bag equals 50 pounds (*id.*), and thus that is the
assumption that Bayer uses here.

shows that in conjunction with his sales of cottonseed to Williams, Willis made at least $164,820. App. 408 (Johnson Decl. ¶ 11).

Johnson testified that these sales were transacted by Willis, his activities were all "authorized" by Willis, and that he did not do "these transactions on [his] own." App. 325 (Johnson Tr. 72:4-21); *see also* App. 408-09 (Johnson Decl. ¶ 13). Indeed, Johnson is not a cotton farmer and has no experience with and does not know anything about cottonseed varieties and pricing. App. 309-10, 316-17 (Johnson Tr. 12:15-13:3; 47:13-48:13); App. 408-09 (Johnson Decl. ¶ 13). For the money that Williams provided to Johnson, Johnson always provided that amount minus payment for his hauling services to Willis. App. 324, 326 (Johnson Tr. 71:1-21 & 92:13-21); App. 407-08 (Johnson Decl. ¶¶ 5-9) (describing Johnson's payments with one exception in which case Johnson actually wrote a check to Willis for an amount greater than he received from Williams).

Williams planted the Caswell Cottonseed that he received from Willis in his fields, and grew a new crop of cotton. App. 335-45, 346-47, 361-65 (Williams Dep. 18:19-28:3, 34:1-35:4, 65:1-69:1). He sprayed this crop with glyphosate and dicamba herbicide, and no herbicide injury occurred, nor was there insect damage, as would have occurred with cottonseed that did not contain Bayer's patented technologies. App. 361-363 (Williams Tr. 65:1-67:21). During investigation for this case, Bayer collected and then later tested some of the Caswell Cottonseed that Williams acquired and had stored in a bulk pile, as well as seeds grown from Caswell Cottonseed that Williams had planted. App. 401-03 (Savage Decl. ¶¶ 3-9); App. 404-05 (Powers Decl. at ¶¶ 3-6). As set forth below, that cottonseed contains each-and-every limitation of at least one claim for all three asserted patents. As such, Willis infringed the Asserted Patents under § 271(a) via his sales of the Caswell Cottonseed (which was Bollgard II® XtendFlex® cottonseed) to Williams, and thus summary judgment should be granted.

### c.   Three Scientific Tests Establish that the Caswell Cottonseed Contains the Patented Bollgard II®, Roundup Ready Flex®, and Xtend Traits.

The Caswell Cottonseed samples that were collected from Williams were scientifically tested to determine the presence of each of the limitations of (a) the '907 Patent (Bollgard II®), (b) the '861 Patent (Roundup Ready® Flex), and (c) the '888 Patent (Xtend). App. 110-111 (Hannah Report ¶¶ 15-17). Specifically, the cottonseed samples were assayed using three separate categories of scientific tests—(1) lateral flow protein testing, (2) polymerase chain reaction (PCR) testing, and (3) DNA sequencing. App. 104-05, 110-15 (Hannah Rep. ¶¶ 3, 15-24). This laboratory testing confirmed the existence of Bayer's patented technology in the Caswell Cottonseed.

The first category of tests, lateral flow protein testing, was used to detect the proteins produced by the Bollgard II® (Cry2Ab), Roundup Ready® Flex (EPSPS), and Xtend (DMO) constructs by Bayer –in particular, Cry2Ab protein for the '907 Patent, EPSPS protein for the '861 Patent, and DMO protein for the '888 Patent. App. 112 (Hannah Rep. ¶ 18). Ten single seed samples for each of the three fields and from the bulk seed lot from Williams were tested, and all 40 samples tested positive for the Cry2Ab, EPSPS, and DMO proteins. *Id.*

The second category of tests, PCR testing, was performed to determine whether specific marker sequences of DNA, as recited in the asserted claims and corresponding to the Bollgard II®, Roundup Ready® Flex, and Xtend constructs, are present in the biological samples by isolating and amplifying the interrogative DNA sequences where present. App. 112-13, 118-19, 125-26, 130 (Hannah Rep. ¶¶ 19, 31, 40, 49). Specifically, the PCR testing determined the existence of SEQ ID NO:17 (for the '907 Patent), SEQ ID NO:2 (for the '861 Patent), and SEQ ID NO:15 (for the '888 Patent), each of which are only present in cottonseed containing the Bollgard® II construct, the Roundup Ready Flex® construct, and the Xtend construct, respectively. *Id.* This PCR testing detected each of these sequences, and thus the corresponding constructs, in Caswell

Cottonseed from all three of Williams's fields, as well as the bulk seed lot. *Id.* Fifty single seed samples each from two of the fields, 50 from the bulk seed lot, and 75 from the last field were tested with PCR. App. 113-14 (Hannah Rep. ¶ 20). Of the 225 seeds tested, two results were excluded because they tested negative as cotton, and 222 of the remaining 223 tested positive for Bayer's patented genes. *Id.* Of those 222, 216 seeds (*i.e.*, all but six of them) tested positive for each of the three constructs. *Id.* For the remaining six seeds, one seed tested positive for the Bollgard II® and Roundup Ready® Flex constructs (and only negative for the Xtend construct); and five seeds tested positive for the DMO and Roundup Ready® Flex constructs (and only negative for the Bollgard II® construct). *Id.*

Additional PCR testing was also performed to detect the presence of a DNA insert having two sequences each encoding EPSPS, as recited by the '861 Patent. App. 54 ('861 Patent, Claim 2); App. 123-25 (Hannah Rep. ¶ 39). Two pools of DNA were made for each of the fields and bulk seed lot, resulting in a total of eight pools that were tested. App. 114 (Hannah Rep. ¶ 22). Each pool contained DNA from eight seeds. *Id.* All eight pools tested positive for each of the two EPSPS genes, as recited in the '861 Patent. *Id.*

The third category of tests, DNA sequencing, further established that the Caswell Cottonseed contains each of the Bollgard® II, Roundup Ready Flex®, and Xtend constructs, and thus infringes the asserted claims of the '907, '861, and '888 Patents. Two pools of DNA were made for each of the fields and bulk seed lot, resulting in a total of eight pools that were tested. App. 114-15 (Hannah Rep. ¶ 23). Each pool contained the DNA from eight seeds. *Id.* Each pool was then sequenced for the regions corresponding to SEQ ID NOs: 14, 15, 16, 17 and 18 of the '907 Patent, SEQ ID NOs: 1 and 2 of the '861 Patent, and SEQ ID NO: 15 of the '888 Patent, as well as a portion of the gene encoding dicamba monooxygenase adjacent to SEQ ID NO: 15, to

demonstrate their operable linkage. *Id.* DNA sequencing identified all of the recited sequences in each pool, and fully confirmed that the Caswell Cottonseed infringes claims 2 and 9 of the '907 Patent, claim 2 of the '861 Patent, and claims 31 and 32 of the '888 Patent. App. 114-15, 119-20, 126-27, 132-33 (Hannah Rep. ¶¶ 23, 32, 41, 50).

As explained and as further demonstrated in a claim chart for each patent below, the three categories of scientific tests demonstrated the presence of each and every limitation of claims 2 and 9 of the '907 Patent, claim 2 of the '861 Patent, and claims 31 and 32 of the '888 Patent in the Caswell Cottonseed sold by Willis.

    *i.   Claims 2 and 9 of the '907 Patent.*

| Asserted Claims of the '907 Patent | Caswell Cottonseed from Mr. Williams |
|---|---|
| **2.** An insect resistant cotton plant, comprising | Preambles are generally non-limiting under Federal Circuit precedent. *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1292 (Fed. Cir. 2015). But regardless, the tested cottonseed is seed from a cotton plant. The cotton plant is insect resistant, particularly to certain types of cotton pests such as bollworm and tobacco budworm, because it contains the Cry2Ab protein which forms crystals that when ingested, are toxic to larvae of several species of insects. App. 108, 121 (Hannah Rep. ¶ 12 & p. 19). |
| incorporated into the plant's genome an insert DNA encoding Cry2Ab and | Incorporated into the genome of the plants and the tested seeds (which are produced by the plants) is an insert (*i.e.*, an introduced sequence of DNA) that encodes for the Cry2Ab protein. As explained above, this was confirmed by the lateral flow protein data, which detected the presence of the Cry2Ab protein. Cry2Ab protein would not be present in the seed unless the plant's genome had a DNA insert encoding for it. App. 121 (Hannah Rep., p. 19). |

| Asserted Claims of the '907 Patent | Caswell Cottonseed from Mr. Williams |
|---|---|
| DNA having nucleotide sequences of SEQ ID NO:14, SEQ ID NO:15, SEQ ID NO:16, SEQ ID NO:17 and SEQ ID NO:18. | The tested cotton seed comprises DNA having the recited nucleotide sequences. This was confirmed by the PCR data (which detected SEQ ID NO: 17) and the DNA sequence data that further confirmed the existence of this sequence as well as that of the SEQ ID NOs: 14, 15, 16, and 18. App. 121 (Hannah Rep., p. 19). |
| **9.** A transgenic seed of the plant of claim 2, where said seed comprises said nucleotide sequences. | The tested cottonseed is seed, which is the seed of a plant of claim 2. The tested seed comprises the insert DNA encoding Cry2Ab and all the nucleotide sequences of SEQ ID NOS: 14, 15, 16, 17 and 18, as explained above. The seed is transgenic seed because it contains genetic material into which DNA from an unrelated organism has been artificially introduced (in particular, the Cry2Ab gene from *Bacillus thuringiensis*). App. 121 (Hannah Rep., p. 19). |

ii. *Claim 2 of the '861 Patent.*

| Claim of the '861 Patent | Caswell Cottonseed from Mr. Williams |
|---|---|
| **2.** A glyphosate tolerant cotton plant, or DNA-containing part thereof, comprising | As above, preambles are generally non-limiting. But regardless, cottonseed is a DNA-containing part of a cotton plant. The tested cottonseed is further a DNA-containing part of a glyphosate tolerant cotton plant, as demonstrated by the cottonseed containing the EPSPS protein, which confers tolerance to the herbicide glyphosate. App. 127 (Hannah Rep., p. 25). |
| incorporated into the plant's genome a DNA insert having two sequences each encoding EPSPS, | Incorporated into the genome of the plants and the tested seed is an insert (*i.e.*, an introduced sequence of DNA) having two sequences encoding EPSPS. As explained above, this was evidenced by the lateral flow protein data, which detected the presence of the EPSPS protein. EPSPS protein would not be present in the seed unless the genome had a DNA insert encoding for it. PCR testing further established that the insert had two different sequences, each encoding EPSPS. App. 127 (Hannah Rep., p. 25). |

| Claim of the '861 Patent | Caswell Cottonseed from Mr. Williams |
|---|---|
| wherein the sequence overlapping the junction between the cotton genomic DNA and the 5'-end of the insert is comprised of SEQ ID NO: 1, and the sequence overlapping the junction between the cotton genomic DNA and the 3'-end of the insert is comprised of SEQ ID NO: 2. | The tested cotton seed comprises DNA having the recited nucleotide sequences. This was confirmed by the PCR data (which detected SEQ ID NO: 2) and the DNA sequence data that further confirmed the existence of this sequence as well as that of the SEQ ID NO: 1. These two marker sequences uniquely recognize the junction between the cotton genomic DNA and the 5'-end of the insert (*i.e.*, SEQ ID NO: 1), and the sequence overlapping the junction between the cotton genomic DNA and the 3'-end of the insert (*i.e.*, SEQ ID NO: 2). App. 128 (Hannah Rep., p. 26). |

*iii. Claims 31 and 32 of the '888 Patent.*

| Claim of the '888 Patent | Caswell Cottonseed from Mr. Williams |
|---|---|
| **31.** A dicamba tolerant seed for providing protection against pre-emergence application of dicamba comprising | As explained above, preambles are generally non-limiting. But regardless, the tested cotton seed is protected against pre-emergence application of dicamba because it contains the DMO protein, which confers protection against the dicamba herbicide. App. 134 (Hannah Rep., p. 32). |
| a DNA encoding a chloroplast transit peptide operably linked to a DNA encoding dicamba monooxygenase | Incorporated into the genome of the tested seed is an insert (*i.e,* an introduced sequence of DNA) having a DNA encoding a chloroplast transit peptide ("<u>CTP</u>") operably linked to a DNA encoding dicamba monooxygenase. As explained above, this was evidenced by the lateral flow protein data, which detected the presence of the dicamba monooxygenase ("<u>DMO</u>") protein. DMO protein would not be present in the seed unless the genome had a DNA insert encoding for it. PCR testing further established that the seed comprises DNA with sequence from a DMO encoding region and with sequence from a CTP having SEQ ID NO:15, and that they are arranged consistently with being operably linked. The DNA sequencing data further confirmed the existence of a DNA insert comprising a DNA encoding a CTP operably linked to a DNA encoding DMO. App. 134 (Hannah Rep., p. 32). |

| Claim of the '888 Patent | Caswell Cottonseed from Mr. Williams |
|---|---|
| wherein the DNA encodes a chloroplast transit peptide comprising SEQ ID NO: 4. | As discussed above, the tested cottonseed has a DNA sequence of SEQ ID NO: 15, as demonstrated by the PCR testing and DNA sequencing. The DNA nucleotide sequence of SEQ ID NO: 15 encodes a chloroplast transit peptide comprising the amino acid sequence of SEQ ID NO:4 of the '888 Patent, which is easily demonstrated by translating the DNA sequence into its corresponding amino acid sequence. App. 134 (Hannah Rep., p. 32). |
| **32.** The dicamba tolerant seed of claim 31, | As discussed above, preambles are generally non-limiting. But regardless, the tested cottonseed is protected against pre-emergence application of dicamba because it contains the DMO protein, which confers protection against dicamba herbicide. App. 135 (Hannah Rep., p. 33). |
| wherein the DNA encoding the chloroplast transit peptide comprises SEQ ID NO: 15. | PCR testing and DNA sequencing established that the tested cottonseed comprises SEQ ID NO: 15 of the '888 patent, which encodes a chloroplast transit peptide. App. 135 (Hannah Rep., p. 33). |

The lateral flow protein data, PCR data, and DNA sequencing data demonstrate that the Caswell Cottonseed sold by Willis to Williams meets each-and-every limitation of claims 2 and 9 of the '907 Patent, claim 2 of the '861 Patent, and claims 31 and 32 of the '888 Patent and therefore constitutes infringement by Willis. Summary judgment, therefore, should be granted that Willis committed patent infringement under 35 U.S.C. § 271(a) by selling the Caswell Cottonseed.

### 4. Willis Admittedly Infringed Bayer's Patents by Offering for Sale Infringing Cottonseed to Garrison Petree.

Under 35 U.S.C. § 271(a), "whoever without authority … offers to sell … any patented invention, within the United States … during the term of the patent therefor, infringes the patent." An offer to sell is defined "according to the norms of traditional contractual analysis." *Rotec Inds., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1254-55 (Fed. Cir. 2000). The defendant, therefore, must communicate a "manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Id.* at 1257

(quoting Restatement (Second) of Contracts § 24 (1979)). Here, there is no dispute that this standard is satisfied. Indeed, Willis admits as much in his deposition.

In particular, Willis was recorded in audio offering for sale cottonseed with Bayer's patented cotton traits to Garrison Petree ("Petree"). The audio recording in its digital form is available at App. 393. A transcript of the recording is available at App. 394-400. Willis does not dispute that it is him on the recording. App. 285 (Willis Tr. 123:12-20). Nor does he contest the accuracy of the transcript. App. 286-87 (Willis Tr. 124:22-125:2).

In the recorded conversation, Willis offers for sale three varieties of Deltapine® cotton seed—specifically, (a) 1845, (b) 1823, and (c) 1549. App. 394 (Transcript at 1). Deltapine® 1845 is Bollgard® 3 XtendFlex® cotton; Deltapine® 1823 is Bollgard II® XtendFlex® cotton; and Deltapine® 1549 is Bollgard II® XtendFlex® cotton. App. 99 (Nixon Decl. ¶ 16); *see also* App. 230-42 (Hannah Rep., Ex. 4) (trait sheets confirming this). In the conversation, Willis offers for sale (a) eight (8) bags of the 1845 seed; (b) fifty (50) bags of the 1549 seed; and (c) fifty (50) bags of the 1823 seed, with each bag at the price of $150. App. 394-95 (Transcript at 1-2). Willis even confirms that a personal check from Petree will be sufficient for payment. App. 396 (Transcript at 3). All of these varieties contain the Bollgard II®, Roundup Ready Flex® and Xtend traits, which are protected by the '907, '861 and '888 Patents, including the asserted claims as discussed above in Section V.B.3.c. App. 97-98 (Nixon Decl. ¶¶ 6, 9, 12); App. 136 (Hannah Rep. ¶ 58).

In addition, in the conversation with Petree, Willis also indicates that he will have in the future an additional 50 bags of "Delta Pine" 1845 cotton seed, a couple hundred bags of 1820 seed, other "dicamba" seed for which he does not name the exact variety, and potentially a few bags of 1646, all for $150 per bag. App. 395, 397-98 (Transcript at 2, 4-5). Deltapine® 1845 is Bollgard® 3 XtendFlex® cotton; Deltapine® 1820 is Bollgard® 3 XtendFlex® cotton; and Deltapine® 1646

is Bollgard II® XtendFlex® cotton. App. 99 (Nixon Decl. ¶ 16); *see also* App. 230-242 (Hannah Rep., Ex. 4) (trait sheets confirming this). All of these varieties thus similarly contain the Bollgard II®, Roundup Ready Flex® and Xtend traits, which are protected by the '907, '861 and '888 Patents. App. 97-98 (Nixon Decl. ¶¶ 6, 9, 12); App. 136 (Hannah Rep. ¶ 58).

Moreover, in the conversation, Willis and Garrison sometimes refer to the Deltapine® 1823 seed as 1820 or 1822. App. 394 (Transcript at 1). As described above, Deltapine® 1820 is Bollgard® 3 XtendFlex® cotton. Deltapine® 1822 is XtendFlex® cotton (App. 99 (Nixon Decl. ¶ 16); App. 230-42 (Hannah Rep., Ex. 4)), which is thus covered by the '861 and '888 Patents. App. 136-37 (Hannah Rep. ¶ 59). Therefore, regardless of the specific variety Willis was offering for sale, that variety is covered by at least two—if not three—of the asserted patents, and thus the unauthorized offer for sale was infringing.

Indeed, Willis admits to making infringing offers for sale. During his deposition, he was asked: "Did you ever tell anyone that you had or would have seed containing the Xtend trait to sell?," and answered "Yes, sir" to "Garrison Petree." App. 277 (Willis Tr. 96:9-13). Willis was then asked: "But you offered to sell him seed containing the Xtend trait; correct?," and answered "Yes, Sir." App. 277 (Willis Tr. 96:14-17); *see also* App. 278 (Willis Tr. 97:2-5) (confirming an offer to sell to Petree); App. 285-86 (Willis Tr. 123:21-124:2). Willis also testified that he was offering for sale "specific varieties of traited seed, Xtend, Bollgard, XtendFlex cotton," which referred to the "seed that was replant seed that was Mr. Caswell's," *i.e.*, the 1820 and 1646. App. 287 (Willis Tr. 125:15-25); App. 292-93 (Willis Tr. 142:21-143:17). As explained above in Section V.B.3.c, the Caswell Cottonseed meets each-and-every limitation of the asserted claims, and thus is infringing. Willis further testified that the other seed that he referred to in the recording,

that might be available later on, was also seed that he was going to get from Caswell. App. 288-89 (Willis Tr. 128:15-129:3).

Regardless of the specific Deltapine® seed numbers that Willis offered, it is clear that he offered for sale cottonseed containing the patented Bollgard II, Roundup Ready Flex, and Xtend traits. Willis admits to such in his deposition. Accordingly, these offers for sale constitute infringement under § 271(a), and thus summary judgment on Counts I, II, and III of the Original Complaint should be granted for this additional reason.

### C.  The Court Should Enter a Permanent Injunction Against Willis.

In light of Willis's infringing activities, Bayer requests that a permanent injunction be granted enjoining Willis from making, using, selling, transferring, or offering to sell or transfer any cottonseed or other seed containing Bayer's patented biotechnologies without Bayer's express permission. *See*, *e.g.*, *Monsanto Prod. Supply LLC v. Rosentreter*, No. 3:16-cv-03038, 2017 WL 4284566, at *4 (C.D. Ill. Sept. 27, 2017) (granting permanent injunction and prohibiting defendant from making, using, selling, or offering to sell any of the patented crop technologies). Willis has infringed Bayer's patents, and has threatened (on recorded audio tape) to do so again in the future. A permanent injunction, therefore, should be granted.

#### 1.  *Legal Standard for Permanent Injunctions.*

"[T]he decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts[.]" *eBay v. MercExchange, LLC,* 547 U.S. 388, 394 (2007). "A plaintiff [seeking a permanent injunction] must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* at 391.

### 2. The Court Should Grant a Permanent Injunction under the eBay Factors.

Bayer has established all four factors necessary for this Court to issue a permanent injunction enjoining Willis from making, using, selling, transferring, or offering to sell or transfer any cottonseed or other seed containing Bayer's patented biotechnology without Bayer's express permission.

### a. Without an Injunction, Bayer Will Suffer an Irreparable Injury.

It is axiomatic that one cannot sell or offer to sell patented inventions without express authorization from the patent holder. Here, Willis has done just that. Without Bayer's consent, he impermissibly offered for sale cottonseed containing Bayer's patented Bollgard II® XtendFlex® traits to Petree (something that he has admitted and was recorded doing), and further sold patented cotton seed to Williams. *See* Section V.B. Willis has also indicated (and been recorded doing so) that he will have additional Bayer cottonseed to sell in the future. App. 288-89 (Willis Tr. 128:15-129:3). And through at least his friend Johnson, it has been disseminated throughout the Lubbock farming community that Willis has Bayer's traited cottonseed for sale. App. 313-15 (Johnson Tr. 38:11-40:5).

If Willis were allowed to continue obtaining Bayer's patented cottonseed and selling it to farmers who then plant the seed year after year, Bayer would lose the protection of its patent and the ability to control the spread of its patented biotechnology. Absent this Court's grant of permanent injunction, Willis's infringement of Bayer's patented biotechnology would cause Bayer irreparable injury. In fact, other federal district courts have recognized that there is irreparable injury to Bayer/Monsanto under the same circumstances because "seeds can proliferate exponentially," and thus infringement could "cause widespread proliferation of plaintiffs' technology in a way that is almost impossible to monitor and redress." *Rosentreter*, 2017 WL 4284566, at *2 (quoting *Monsanto Co. v. Hargrove*, No. 4:09-CV-1628 CEJ, 2011 WL 5330674,

34

at *6 (E.D. Mo. Nov. 7, 2011)). "The ability of plaintiffs' seed technology to rapidly self-replicate is the reason that plaintiffs grant only limited, single-use licenses for their products" in the first place. *Hargrove*, 2011 WL 5330674, at *6; *see also Monsanto Co. v. Parr*, 545 F. Supp. 2d 836, 844 (N.D. Ind. 2008) ("The quantities of black market seed can be substantial—a single soybean seed grows into a plant that will conservatively produce 36 soybeans. Thus, even a small quantity of saved seed can result in a very large, illicit supply over the course of one season.").

### b. <u>Money Damages Are Insufficient to Provide Relief to Bayer.</u>

Nothing in the record suggests that Willis will stop infringing Bayer's patents without the imposition of a permanent injunction. While Willis was caught offering seed for sale to Petree, and selling cottonseed to Williams, he denied these actions until confronted with specific evidence. He was also recorded telling Petree that he would have additional seed for sale containing Bayer's patented traits in the future (App. 288-89 (Willis Tr. 128:15-129:3)), and his facility contains substantial quantities of Bayer's patented cottonseeds. App. 290-91 (Willis Tr. 131:1-132:19) (discussing Caswell's seed in Willis's barn). Further, Willis has committed perjury in this action, hiding and lying about his involvement in the sale of infringing cottonseed, until forced to come clean by documentary evidence and his now-withdrawn counsel. *See*, *e.g.*, ECF No. 61; Bayer's Motion for Sanctions (forthcoming). Willis's actions indicate that future infringement is likely, rendering money damages an insufficient remedy. *See Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1155 (Fed. Cir. 2011) (recognizing that money damages are insufficient where future infringement is possible and noting that "[t]here is no reason to believe that [the defendant] will stop infringing, or that the irreparable harms resulting from its infringement will otherwise cease, absent [a permanent] injunction"); *Hargrove*, 2011 WL 5330674, at *6 ("[D]efendants' willful infringement and uncooperative conduct during this litigation demonstrates the likelihood that they will continue to infringe [the patented biotechnology] absent" an injunction).

Moreover, the nature of seed replication renders monetary damages insufficient. As courts faced with this issue have recognized, "[t]he nature of seed reproduction suggests that multiple lawsuits could be necessary each time the seed is wrongfully replanted and resold." *Rosentreter*, 2017 WL 4284566, at *2. But this is not practical or even possible. A single cottonseed can result in 192 or more seeds in the next season. App. 99 (Nixon Decl. ¶ 18). With exponential growth, after just three growing seasons, this can result in 7,077,888 infringing seeds (192 cubed, or 192x192x192), if not more. And in just one growing season, an acre of planted cottonseed can result in 10 million new seeds. *Id.* Thus, "[t]he very nature of this case compels injunctive relief." *Parr*, 545 F. Supp. 2d at 844. "Without injunctive relief, [Bayer] would be in the position of having to repeatedly investigate and file lawsuits seeking damages against [Willis, his customers, and his customers' customers] *after* discovering a new crop of saved [cottonseed with Bayer's patented traits]." *Id.* (emphasis in original).

### c.   The Balance of Hardships Warrants a Permanent Injunction.

The balance of hardships greatly favors Bayer because Bayer will be irreparably harmed by future unauthorized sales and use, and Willis will not be substantially harmed by a grant of an injunction because he has no right to use, sell, or offer to sell Bayer's patented crop technology without authorization. 35 U.S.C. § 271(a); *see Novozymes A/S v. Genecor Int'l, Inc.*, 474 F. Supp. 2d 592, 613 (D. Del. 2007).

Bayer has expended enormous effort, time, and resources to develop the patented biotechnologies in its cottonseed. As this case demonstrates, however, obtaining Bayer's proprietary technology remains exceedingly simple for unlicensed users. As the United States Supreme Court has noted, "[F]armers themselves need only buy the seed once, whether from Monsanto, a competitor, or. . . a grain elevator [or delinter such as Willis] . . . [then] multiply [the] initial purchase, and then multiply that new creation, *ad infinitum*—each time profiting from the

36

patented seed without compensating its inventor." *Bowman v. Monsanto Co.*, 569 U.S. 278, 285-86 (2013).

Given the extraordinary time, effort, and resources expended by Bayer and the ease with which the fruits of Bayer's labor may be disseminated, federal district courts have protected Bayer's patent rights by granting permanent injunctive relief in similar cases. *See Rosentreter*, 2017 WL 4284566, at *3-4 (under similar facts finding the balance of harm favors Monsanto); *Hargrove*, 2011 WL 5330674, at *6 (under similar facts the Court found "that the balance of harms between the parties … favor the entry of a permanent injunction"); *Monsanto Co. v. McFarling*, No. 4:00-CV-84 CDP, 2005 WL 1490051 (E.D. Mo. June 23, 2005) (issuing a permanent injunction against defendant farmers who saved seeds for replanting); *Monsanto Co. v. Ralph*, No. 4:00-CV-135 RWS, 2003 WL 25276984 (E.D. Mo. July 9, 2003) (same), *vacated in part on other grounds by Monsanto Co. v. Ralph*, 382 F.3d 1374 (Fed. Cir. 2004)).

### d.  <u>The Grant of a Permanent Injunction Is in the Public Interest.</u>

Finally, it is in the public interest to issue a permanent injunction prohibiting Willis from infringing Bayer's patent rights because "the public interest is advanced by enforcing faithful compliance with the laws of the United States…." *MetroPCS v. Devor*, No. 1:15-cv-02949, 2016 WL 6133869, at *8 (N.D. Ill. October 14, 2016) (granting permanent injunction in trademark infringement case); *Scruggs*, 249 F. Supp. 2d at 760 (in granting a preliminary injunction in favor of Monsanto, the district court noted "[t]he public interest is not served by allowing an infringer to profit at the expense of the holder of a lawfully issued patent"); *see also Commonwealth Sci. & Industrial Research Org. v. Buffalo Tech. Inc.*, 492 F. Supp. 2d 600, 607 (E.D. Tex. 2007) (same).

Issuing a permanent injunction here is not "contrary to a significant public interest such as health and safety concerns" and therefore should be granted. *Buffalo Tech*, 492 F. Supp. 2d at 607 (recognizing only a limited number of circumstances where granting a permanent injunction in a

patent case would violate the public interest). To the contrary, enjoining Willis's conduct will protect the interests of law-abiding growers, who obtain and use seed technology through authorized channels, by preventing an increase in the illegal supply of patented seeds, which takes away authorized farmers' competitive advantage. *Parr*, 545 F. Supp. 2d at 844 ("The public interest favors the entry of an injunction so as to stop the proliferation of an illegal supply of [patented] soybeans."). "[N]o public interest will be disserved by the permanent injunction, which will support the public interest in enforcing lawful patents and protecting law-abiding farmers." *Rosentreter*, 2017 WL 4284566, at *4.

Accordingly, in light of Willis's unauthorized sales and offers to sell Bayer's patented seed biotechnologies, Bayer requests summary judgment finding an injunction proper and entering an injunction pursuant to Federal Rule of Civil Procedure 65, permanently enjoining Willis from making, using, saving, cleaning, delinting, planting, selling, offering to sell, importing, or otherwise transferring any cottonseed or other seed containing any of Bayer's patented technologies, including those in the Asserted Patents, without express written permission from Bayer.

### D.  The Court Should Enter an Award of Damages for Bayer.

Bayer is entitled to damages in the amount of a reasonable royalty based on Willis's sales of saved Bollgard II® XtendFlex® cottonseed.[4] *See, e.g.*, *Monsanto v. David*, 516 F.3d 1009, 1016-19 (Fed. Cir. 2008). The Court, therefore, should also grant summary judgment that Bayer is entitled to damages, and award $17,327,358 in reasonable royalty damages.

---

[4] Bayer is also entitled to prejudgment interest, costs, and attorney fees, which it reserves the right to move for after decision on this motion for summary judgment and/or entry of judgment.

### 1. Legal Standard for Reasonable Royalties.

"Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. In the absence of an established royalty rate, "[t]he royalty may be based upon…the supposed result of hypothetical negotiations between the plaintiff and defendant." *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995).

The determination of a reasonable royalty is done in light of all relevant facts including those set forth in *Georgia-Pacific*. *See Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970) (listing fifteen (15) relevant evidentiary facts used to determine the reasonable royalty). These relevant facts are helpful in establishing a reasonable royalty, but "the court is neither constrained by them nor required to consider each one where they are inapposite or inconclusive." *Brunswick Corp. v. United States*, 36 Fed. Cl. 204, 211-212 (Fed. Cl. 1996). Expert testimony typically establishes the royalty rate. *See*, *e.g.*, *Mobil Oil Corp. v. Amoco Chem. Corp.*, 915 F.Supp. 1333, 1353 (D. Del. 1994); *see also* 35 U.S.C. § 284 (providing for expert testimony on the issue of damages).

Although a reasonable royalty rate is often a question of fact, courts grant summary judgment where the plaintiff has submitted expert evidence as to a reasonable royalty, and the defendant provides no expert analysis (or other relevant and admissible evidence) to dispute plaintiff. *See*, *e.g.*, *Domestic Fabrics Corp. v. Sears, Roebuck & Co.*, 325 F. Supp. 2d 612, 619 (E.D.N.C. 2003); *see also Celotex Corp.*, 477 U.S. at 322-24. Here, Willis has not disputed the testimony of Bayer's damages expert, Mark Hoffman, and thus judgment should be granted.

### 2.   *The Court Should Award Reasonable Royalty Damages of $17,327,358.*

Bayer served on Willis the damages expert report of Mark Hoffman, a Certified Public Accountant (CPA), Certified Management Accountant (CMA), Certified Valuation Analyst (CVA), and Certified Licensing Professional (CLP). *See* App. 441-578 (Expert Report of Mark Hoffman ("Hoffman Rep.")); App. 439-40 (Declaration of Mark Hoffman ("Hoffman Decl.")). After a comprehensive review and thorough analysis of the facts pertinent to this proceeding, Hoffman concluded that Bayer is entitled to a reasonable royalty of $19,062 per infringing unit (or bag) of cottonseed that Willis sold. App. 493 (Hoffman Rep. at 49). Given that Willis sold 909 units, as explained above, this yields a total royalty due of $17,327,358.

Even while represented by counsel, Willis did not respond or oppose Hoffman's expert opinion and failed to serve a rebuttal opinion. Willis similarly decided not to depose Hoffman. This is likely because Hoffman is a well-qualified damages expert, whose opinions and analysis as to patented seed technology have been accepted by district courts and the Federal Circuit in similar cases on behalf of Bayer's predecessor, Monsanto. *See*, *e.g.*, *Monsanto Co. v. McFarling*, 488 F.3d 973, 981 (Fed. Cir. 2007); *see also Monsanto Co. v. Scruggs*, 890 F. Supp. 2d 729, 732 (N.D. Miss. 2012) (awarding $8.9 million in reasonable royalties with Hoffman as the damages expert). Hoffman's analysis is based upon the considerations outlined in *Georgia-Pacific*. He focuses on the commercial success of Bayer's patented seed technology and the difficulty Bayer faces in protecting its patent rights, and applies the facts of this case to determine the economic benefits for the unauthorized use of Bollgard II® XtendFlex® cottonseed, as well as the risks and harm to Bayer. *See* App. 447-78 (Hoffman Rep. at pp. 3-34).

Hoffman, analyzing the *Georgia Pacific* factors in depth, recommends a reasonable royalty to compensate Bayer for the unauthorized use by growers of its technology (*i.e.*, saving and planting the patented seed) at $1,733 per unit, and for the unauthorized sale or transfer of its

technology (*i.e.*, by seed sellers such as Willis) at $19,062 per unit. App. 479-93 (Hoffman Rep. at 35-49 & specifically, 46, 49). Hoffman explains that the royalty rate for a seller (such as Willis) is higher than the rate for a grower because of the "increased benefits, risks, and harm associated with infringing sold and/or transferred seed." App. 490 (Hoffman Rep. at 46). In particular, Hoffman considers that a single planted cottonseed can result in 120 new cottonseeds (*i.e.*, it is "self-multiplying"), which quickly results in the possibility of the seller bulking up on seed and Bayer losing control of its technology, considering the exponentially large number of seeds grown after just a few seasons. App. 490-92 (Hoffman Rep. at 46-48). Hoffman's numbers are actually conservative, as a single cottonseed can result in 192 or more seeds (as opposed to 120 in Hoffman's conservative calculations). App. 99 (Nixon Decl. ¶ 18). Moreover, Hoffman considers a few scenarios, in which the cottonseed is multiplied 11 times, 73 times, and 120 times, and then conservatively selects a reasonable royalty based on the smallest seed-multiplication scenario. *Id.*

Willis has tendered no expert report and has not challenged the expertise of Hoffman or his opinion on damages. Accordingly, there is no material question of fact before the Court on the issue of damages and summary judgment is appropriate. *See, e.g.*, *Domestic Fabrics*, 325 F. Supp. 2d at 619 (granting summary judgment on a reasonable royalty in a patent case). As such, the Court should grant summary judgment on damages in the amount of $17,327,358.

### E. The Court Should Find Willis's Patent Infringement Was Willful and Intentional, and Enhance Damages.

The Court may award Bayer enhanced damages under 35 U.S.C. § 284 and should do so given Willis's egregious conduct and his willful patent infringement, which is not in dispute. The Court should enhance damages up to three times in its discretion as allowed by the statute.

###### 1.   *Legal Standard for Enhanced Damages.*

Enhanced damages "are not to be meted out in a typical infringement case." *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 579 U.S. 93 (2016). Instead, they are saved for cases such as the instant one, in which the defendant's conduct has been "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." *Id.* That is, enhanced damages are generally provided for "egregious cases of culpable behavior." *Id.*

"[C]ulpability is generally measured against the knowledge of the actor at the time of the challenged conduct." *Id.* at 1933. Therefore, the accused infringer must know that its acts constitute patent infringement, *i.e.*, the infringement must be willful. *See WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1341 (Fed. Cir. 2016); *Halo*, 579 U.S. at 111 (Breyer, J., concurring). After a finding of willful infringement, courts have discretion in whether to grant enhanced damages . In doing so, courts examine the egregiousness of the defendant's conduct, and often consider the non-exclusive *Read* factors. *See Presidio Components, Inc. v. Am. Technical Ceramics Corp.*, 875 F.3d 1369, 1382-83 (Fed Cir. 2017) (citing *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 827 (Fed. Cir. 1992)). Courts further have discretion in how much enhanced damages to award, up to the statutory limit of three times. *See Halo*, 579 U.S. at 106 ("District courts enjoy discretion in deciding whether to award enhanced damages, and in what amount.").

###### 2.   *The Court Should Enhance Damages for Willis's Willful and Egregious Infringement.*

This is a case that supports enhanced damages. All of the adjectives used by the United States Supreme Court in *Halo* describe Willis's conduct. That is, his infringement was "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, [and]—indeed— characteristic of a pirate." *Halo*, 579 U.S. at 103-104. Despite knowing that selling Bayer's patented seed without authorization was illegal, and that he had no such authorization, Willis sold the seed anyway. Willis's infringing sales were intentional, willful, and wrongful, and he has no

just cause or excuse for them. This has been confirmed by Willis's conduct before and after the filing of the present lawsuit. He has not argued that the seed he sold does not infringe, or no longer argues that the patents are invalid. Instead, as will be outlined in the forthcoming Motion for Sanctions, Willis committed perjury, concocting a lie in which he denied that he was even involved in the sales to Williams. This story, however, was fiction, repeatedly morphing over time and contributing to the withdrawal of Willis's counsel, until the scope of Willis's infringement (at least some of it) finally became clear.

Willis's infringement has not been unintentional. Nor can it be swept aside or excused. Willis has long known that seed cannot be saved and resold. Before his patent infringement, he had a long history in the seed industry for over 10 years. Willis actually worked for Bayer, including at multiple of its cottonseed facilities for five-and-a-half years, reaching the position of "regional manager." *See* App. 421-28, 433 (Willis Tr. 15:14-22:15 & 44:2-13). And after his time working for Bayer, Willis went to another cottonseed company, West Gaines Seed, which produced cotton for Nexgen, and he worked there for two years. App. 428-29 (Willis Tr. 22:16-23:5). After that, Willis remained in the agriculture industry for more than another six-and-a-half years, first working for Berkley Ag Insurance, then inspecting fields for herbicide damage for Dow (now Corteva, a competitor to Bayer), and being a consultant—until he purchased the delinting facility in Slaton, Texas. App. 429-32 (Willis Tr. 23:6-26:25).

Willis further testified that "in 2020 when [he] began delinting seed, even though [he wasn't a farmer or grower], that it was ***not legal*** for a farmer to plant patented cottonseed from a prior harvest and plant it." App. 434 (Willis Tr. 81:19-24). He knew this was legal for some conventional seed, but that for traited seed it would be a "violation" of patent rights. App. 434-35 (Willis Tr. 81:25-82:7). And Willis "knew the difference between conventional seed and seed that

was traited and patent protected." App. 436 (Willis Tr. 180:4-22). Indeed, he specifically testified that he knew Bayer's Roundup Flex, Xtend, and Bollgard traits were "patented technologies." *Id.* Despite this, Willis sold Bollgard II® XtendFlex® cottonseed to Williams, willfully and egregiously infringing on Bayer's patent rights.

Because Willis willfully infringed the patents-at-issue, and his conduct was egregious and malicious, the Court should enhance the damages. This is confirmed by the *Read* factors. Willis deliberately sold exact (self-replicated) copies of Bayer's technology (factor 1). *Read*, 970 F.2d at 827; *see also Bowman*, 569 U.S. 278 (finding it was infringement to plant saved traited seed protected by patents). Despite knowing the seeds at issue here were patented, Willis made no efforts to form a "good-faith belief that [the patents were] invalid or that [they were] not infringed" (factor 2). *Read*, 970 F.2d at 827. Willis no longer contests validity of the Asserted Patents, and he has not argued that the seeds at issue do not infringe the Asserted Patents. Wills further has repeatedly concealed his infringing actions, to the extent that his perjurious testimony contributed to his counsel's withdrawal, and he has taken no efforts to remediate his infringement (factors 3, 7 and 9). *Id.* at 827; *see also* ECF No. 63. This is not a close case with arguments of non-infringement (factor 5); Willis intentionally infringed to make money at Bayer's expense (factor 8), and he only stopped when he was caught (factor 6). *Read*, 970 F.2d at 827. The *Read* factors overwhelmingly indicate that damages should enhanced. The Court, therefore, should grant summary judgment, enter a finding of willfulness, and enhance damages in an amount up to three times that the Court finds just in its discretion.

## VI.   <u>CONCLUSION</u>

Plaintiffs Bayer CropScience LP and Monsanto Technology LLC, pray that the Court: (1) enter judgment as a matter of law finding that the '907, '861 and '888 Patents are valid; (2) enter judgment as a matter of law holding Defendant liable for infringement of Plaintiffs' patent rights

in the '907, '861 and '888 Patents; (3) entry of a permanent injunction enjoining Defendant from making, using, saving, cleaning, delinting, planting, selling, offering to sell, importing, or otherwise transferring any cottonseed or other seed containing any of Bayer's patented technologies, including those in the Asserted Patents, without express written permission from Bayer; (4) entry of damages in the form of a reasonable royalty of $19,062 per unit (or bag) of infringing cottonseed, for a total of $17,327,358 for the 909 bags sold, and (5) entry of a judgment finding willfulness and enhancing the damages.

Dated:  November 28, 2022

Respectfully submitted,

**THOMPSON COBURN LLP**

By */s/ Daniel Cox*
    Nicole L. Williams
    Texas Bar No. 24041784
    nwilliams@thompsoncoburn.com

    2100 Ross Avenue, Suite 3200
    Dallas, TX 75201
    214-629-7113
    972-629-7171 (facsimile)

    Jeffrey Masson, MO Bar No. 60244
    (*pro hac vice*)
    jmasson@thompsoncoburn.com
    Daniel Cox, MO Bar No. 38902
    (*pro hac vice*)
    dcox@thompsoncoburn.com
    Matthew Bober, MO Bar No. 59825
    (*pro hac vice*)
    mbober@thompsoncoburn.com

One U.S. Bank Plaza
St. Louis, MO 63101
314-552-6030
314-552-7000 (facsimile)

*Attorneys for Plaintiffs Bayer CropScience*
*LP and Monsanto Technology LLC*

## <u>CERTIFICATE OF SERVICE</u>

This certifies that on November 28, 2022 the undersigned filed this document with the

Court's electronic filing system and served a true and correct copy of this document upon Teddy

Willis via electronic mail, as well as with a courtesy copy provided via mail.

*        /s/ Daniel Cox        *
